THE BANK COMMISSIONERS *v.* THE RHODE ISLAND CENTRAL BANK.

To justify the action of the bank commissioners, or of the court against a bank, under ch. 126, § 47, of the Revised Statutes, on the ground, that " it is so managing its concerns, that the public, or those having funds in its custody, are in danger of being defrauded thereby," it is not necessary that either should be satisfied that there is a formed design on the part of the managers to cheat the bill-holders or the depositors, but only that the condition of the bank, from its gross and illegal mismanagement, and the temptation to, and danger of fraud, growing out of it, are such, that the commissioners and the court ought to interfere to prevent it.

Past mismanagement, though violative of the charter of the bank, or followed by insolvency, is to be dealt with upon those special grounds, enumerated in the same section as distinct grounds of interference; and where the dangerous condition of a bank is owing to the mismanagement of a former board of managers and body of stockholders, to whom a new board, and, in part, body, have succeeded, under the eye and with the approbation of the bank commissioners, with a view of retrieving the condition of the bank, the court will not interfere with the bank on the ground of mismanagement, whilst pursuing the course marked out for it by the commissioners, unless in a plain case of complicity, or of gross ignorance, or dereliction of duty, on the part of the commissioners.

THIS was an application by the bank commissioners, under ch. 126, § 47, of the Revised Statutes, to enjoin the Rhode Island Central Bank from further exercising the powers and franchises conferred by its charter, and to wind up its affairs through a receiver, on the ground, averred in the application, that said bank " is so managing its concerns, that the public, or those having funds in its custody, are in danger of being defrauded thereby." A temporary injunction having accompanied the citation under the 54th section of the above chapter, upon the final hearing upon the questions whether the injunction should be removed or be made perpetual, and a receiver appointed to wind up the bank, the following facts, material to the matters in issue, appeared : that this bank was chartered by the general assembly at the October session, 1805, with a capital of $100,000, but with power of increasing the capital " to an amount not exceeding $500,000, under such rules and restrictions as a majority of the stockholders, regularly convened for that purpose, may establish ; " that on the 12th day of November, 1856, the capital of the bank being then about $121,711.86, it was voted to increase it by the sum of $375,000,

—thus raising it to the sum of $496,711.86 ; that $300,000 of this increase of capital stock was taken by and transferred on the books of the bank to thirty persons, all living out of the state, in amounts of $10,000 each, each of them giving therefor to the bank his promissory note for the sum of $10,000, payable in five years, in the bills of the bank,—the other $75,000 of the increase being charged on the books of the bank to other parties, to whom certificates for the same were never issued, they refusing to take the stock and give their notes for the same ; that thereupon, on the same day of this increase of capital stock, the directors proceeded to discount notes, principally of these new stockholders, and to pay out and put in circulation bills of the bank to very large amounts, so that the circulation of the bank suddenly rose in this mode to the sum of about $390,000, in addition to about $42,000, since ascertained to be the old circulation of the bank, then outstanding. In this state of things, the bank was visited, on the 14th day of November, 1856, by a special commission raised for that purpose by the governor, who, finding that so large a portion of the assets of the bank as $300,000 of stock notes rested for its value upon the credit of persons of whom they could ascertain nothing, insisted that this paper should be changed for paper, not to run longer than one year, of persons whose credit at least was supposed by them, upon inquiry, to be good ; and with their approval, the $300,000 of stock notes were given up upon a retransfer of stock to that amount to the bank ; and the same stock was transferred to the amount of $100,000 to John J. Anderson, of $100,000 to Smith & Goodell, of $20,000 to J. Y. Sanger, of $20,000 to J. L. Stewart, of $20,000 to W. D. Sanger, of $20,000 to L. P. Sanger, and of $20,000 to John Brown—firms and persons in the western country supposed by the commissioners, after inquiry made, to be in good standing—and their notes, payable in one year in the bills of the bank, given to the bank in corresponding amounts therefor. The commissioners also recommended that the business and circulation of the bank be curtailed; that more specie funds be acquired by the bank, and that the "*protected circulation*" of the bank—that is, the circulation discounted and redeemed abroad,

in New York and in the west, under contracts between the bank and its customers there—be annulled, so soon as the contracts on time for the same had expired. Under the surveillance of this commission, it appears that the circulation of the bank was reduced nearly $40,000, so that the circulation of the bank stood at the time of their report at about $352,000, not including the old circulation of about $42,000, before spoken of, and the bank went into new management, a new president and cashier having been appointed in the early part of the month of December, 1856. On the 2d day of February, 1857, the directors voted that the $75,000 of stock, for which no certificates had been issued, be held by the bank for sale to such persons and upon such conditions as the bank might approve. On 2d day of March, 1857, the president and cashier were authorized by a vote of the directors to purchase for the bank as much of the stock of the bank as should be for its interest. Under this vote, the president and cashier, in August and September, 1857, bought for and received transfers to the bank from sundry of its stockholders, of stock to the amount of about $94,000, surrendering to the sellers their notes to that amount in payment therefor; so that, on the 30th of September, 1857, the date of the last purchase of stock by the bank, the bank held of its nominal stock $169,000—to wit, $75,000 of it which had never been transferred, and $94,000 of it, purchased as aforesaid. At the time of this purchase by the bank of its stock, its new or protected circulation was about $392,000, and its old or miscellaneous circulation was about $42,000, as near as the latter could be ascertained, making in all an aggregate of about $434,000.

This application was filed on the 3d day of October, 1857, and since the application the circulation of the bank has been gradually reduced, standing at $244,000 on the 30th November, 1857, and at $162,351 on the 5th day of December, 1857, the day of the hearing—to which, however, is to be added the $42,000 of old or miscellaneous circulation before spoken of. To meet its circulation, for the deposits were small, and its specie and deposits in other banks were inconsiderable, the bank relied, at the time of the application, upon its bills receivable, payable

in the bills of the bank to the amount of about $500,000, about $486,000 of which was due to it from three firms in St. Louis, Mo., to wit, Sanger, Stewart & Co. about $219,000, Smith & Goodell about $139,000, and J. Anderson & Co. about $127,000; its bills receivable, however, having been reduced by payment pending the application to about $380,000 by the return of circulation to an amount corresponding to the amount of the reduction.

*Charles Hart, Esq.,* attorney-general, for the Bank Commissioners.

*T. A. Jenckes* and *Bradley*, for the Bank.

AMES, C. J. This application confines itself to the last of the three grounds mentioned in ch. 126, § 47, of the Revised Statutes, pp. 290, 291, upon which the court is authorized to intervene by injunction, and through a receivership to wind up the affairs of a bank. It alleges, under the oath of the bank commissioners, that this bank, in the language of that section, "is so managing its concerns, that the *public,* or *those having funds in its custody,*" referring of course to the bill-holders and depositors of the bank, "are in danger of being defrauded thereby." We do not apprehend that by using the word "defrauded" in the above connection, the general assembly intended that the commissioners should suppose, or that the court should find, in order to justify the action of either, a formed design on the part of the managers of a bank to cheat either of the classes of its creditors, who seem to be peculiar objects of protection in this clause of the section. It is not *fraud* of the *managers,* but *danger* that such creditors may be defrauded by *the management* of a bank, that is mentioned in the section as a ground for interference. The statute, looking to the power of banks to issue bills as currency, and the wide credit in this way so easily obtained by them according to our habits of business, and to their power to discount, with its attendant power of *inviting* and in one sense of *compelling* deposits as implied conditions of accommodations by discount, properly regards them as dangerous machines, which require constant supervision and control, lest, it may be, without any original formed design on the part of their directors, their bill-holders and depositors may,

by *the mode of management,* be in danger of being defrauded. In view of the weakness of human nature, it recognizes, in short, that certain conditions of things may exist in the affairs of banks, which, on account of the great profit which may be made out of them, or the heavy loss which may be avoided, offer such temptations to fraud on the part of those managing or those influential in the management of banks, as to justify interference by the proper authorities in order to prevent it.

Something has been said of the large discretion which this construction gives to the commissioners and to the court, constituting them boards of control, in truth, over all the banks of the state. As to the commissioners, it is quite plain that the statute, so far from imposing limits to their power of inquiry, arms them with the fullest powers to make it effectual, and leaves it solely to their discretion, as responsible officers of the law, to make such applications to this court, under oath, as the exigency seems to them to require. The court can act only in specified cases—1st, of forfeiture of charter; 2d, of insolvency; and 3d, of such mismanagement of a bank as leads to the conclusion that its bill-holders or depositors are in danger of being defrauded. We are not aware that intervention by a court of equity in cases analogous to the case at bar, and that too by injunction and receivership, is new or unusual. It is quite frequent for the purpose of winding up partnerships; and *in this* aspect, what in truth are our banks but partnerships, with peculiar and in some respects dangerous powers, so far as the public are concerned, requiring the interposition of public commissioners to take care of the interests of small and scattered bill-holders, and it may be, enslaved depositors, instead of leaving application to the tribunals of the law to be made, as in ordinary partnerships, by the members or creditors of the firm. The commissioners probably would not, and the court certainly would not, interfere in cases of mismanagement, which, however unfortunate to those interested in the stock of the bank, would not endanger the public; leaving such mismanagement to be cured by the election of new directors under the charter, and its consequences to be remedied by the responsibleness of the old ones to the bank, in their character of its officers and

trustees. But when the mismanagement is so gross and alarming as to jeopard the public, and especially if at the same time it be violative of plain statutory provisions passed for the very purpose of guarding bill-holders and depositors of the bank against the danger of being defrauded, interference by the public authorities, in the mode here invoked, is certainly justified, not only by prudence and common sense, but by authority derivable from the constant exercise by a court of chancery in similar cases, of its most common and valuable powers.

In this view of the statute under which we are called to act, the question is, whether the Rhode Island Central Bank was, at the time of this application, so managing its affairs that the public were in danger of being defrauded by its management? We say, *at the time of this application,* because the statute uses the present tense, " is managing," &c., in speaking of the ground upon which this application solely relies—leaving *past mismanagement* in violation of the charter of a bank, or when followed by actual " insolvency," to be dealt with upon those special grounds. At the time of this application, this bank, with a nominal capital of $496,711.86, $75,000 of which had never been sold or transferred to any one, and $300,000 of which, though transferred to certain persons and firms, had never been paid for, but only secured by their promissory notes, had an outstanding circulation of at least $434,000; and this, too, although the bank, in the months of August and September previous, had cancelled the sales of stock to its principal stockholders to the amount of about $94,000, and surrendered to them their notes given to secure payment for it to that amount.

Now, for the express purpose of guarding against a fraudulent and irredeemable bank circulation, the 28th section of ch. 126 of the Revised Statutes requires, under the heaviest penalties, that no bank " shall at any time have bills or notes of said bank in circulation exceeding its capital stock *actually paid in.*" Such *actual* payment must, in our view, be " in cash," as explained by the 7th section of the same chapter, in order to form the required statute basis for circulation to an equivalent amount; something, we apprehend, very different from the mere promises to pay, of distant stockholders, upon long time. In this

2 *

view, the circulation of the bank at the time of this application, exceeded its statute limits by a sum exceeding $300,000. But, waiving this, surely no one can contend that the $75,000 of the new stock, never sold or paid for even in notes, has been "actually paid in," in the sense of the above section, or that the $94,000 of stock paid for only in notes, when taken back by the bank and the notes taken for it surrendered, was capital stock "actually paid in," in such sense as to afford a safe basis for the circulation of the bills of the bank to an equivalent amount. Granting only this, the circulation of the bank exceeds the statute limits by upwards of $100,000. When, in addition to this, it is recollected, that nearly all the "bills receivable" of this bank, to meet this large and excessive circulation, consist mainly of the promissory notes of three firms in St. Louis, payable in the bills of this bank only, how can it be said in the sense of our law that this bank was not, at the time of the application, "so managing its affairs" that the public "was *in danger* of being defrauded thereby?" However honest the original design of the promoters of the scheme which has produced this state of things may have been, we cannot shut our eyes to *the danger* of fraud upon the public resulting from it, which the statute directs us to guard against; a danger resulting from an excessive circulation, wholly within the control of a few individuals, residing and operating with it at a distance, whose means are mainly relied on to redeem it, and whose mere will may, at any time, depress its value to any point that they may deem convenient, in order to enable them more cheaply to get it in and cancel with it their obligations to the bank. The very form of these obligations, making them payable only in the bills of this bank, points clearly to this danger. It is not enough to say, in answer to this, that such a fraud has not yet been perpetrated. The statute looks to the future, and directs us to guard against *the danger* of fraud which all experience warns us to lie in conditions of affairs so inviting to it.

There is one view of this case presented by the counsel for the bank, which, if it had been sustained by the facts, seemed to us at the hearing, looking at the ground of this application, to present insurmountable difficulties to our proceeding farther

upon it. It is, that granting the condition of this bank to threaten the danger we have spoken of, yet this is wholly the result of a former management, to which the present stockholders and managers succeeded under the eye and with the advice of the special commissioners of November, 1856, upon certain terms involving a large pecuniary responsibility; and that having ever since conducted the bank in conformity with the directions given to them by these visitors of the state, so far from "mismanaging" now, to the danger of the public, their efforts have been directed to rescuing the public from the danger resulting from the *former* mismanagement of the bank. Certainly this court would not exercise its powers in such mode as to enable the accredited state visitors of a bank to practise a fraud upon those whom they had invited at great outlay and risk to its management; or, except in a plain case of complicity, or of gross ignorance or dereliction of duty on the part of the commissioners, hold, under the circumstances supposed, *that* to be present mismanagement, which such commissioners had directed or approved as the means of remedying *former* mismanagement.

The case before us does not, however, afford a basis for this defence. It is true, that the new managers complied with some of the directions of the special commissioners, especially in taking the new stock notes for $300,000 on one year's time, instead of. five years, the time of the first set of stock notes to that amount, and in reducing the circulation of the bank, whilst under the eye of those commissioners, from about $390,000 to about $352,000; but between the date of the report of those commissioners and of this application, the circulation of the bank rose again above its old level, to about $392,000, without reckoning, in either case, the $42,000 and upwards of miscellaneous or unprotected circulation then and now outstanding. This increase of circulation, already so excessive, took place and was continued, notwithstanding the simultaneous reduction of the bills receivable and stock of the bank, in August and September last, in the serious amount of about $94,000.

Under such circumstances, our duty is too plain to admit of doubt; for although it is true that the circulation of this bank

has been greatly reduced during the pendency of this application, this cannot atone for the state of things existing at the time the application was made, nor render us insensible to the danger of the public from an institution conducted, it would seem, solely for the purpose of driving out and keeping out an excessive circulation, for the full and prompt redemption of which, in any form of value, its means and management afford so little security.

Let a decree be entered, appointing a receiver to settle and wind up the affairs of the Rhode Island Central Bank, and perpetually enjoining it from further exercising the powers and franchises conferred by its charter.